**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-273 (TNM)** |
| **v.** | : | |
| | : | |
| **MILES BRANDON ADKINS,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Miles Brandon Adkins ("Adkins") has pleaded guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Two). For the reasons set forth herein, the government requests that this Court sentence Adkins to 45 days of incarceration on Count One and 36 months of probation on Count Two. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

I.     **Introduction**

Defendant Adkins, a 39-year old elected school board official and former Marine, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the

1

peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Adkins pleaded guilty to violations of 40 U.S.C. § 5104(e)(2)(D) and (G). As explained herein, a sentence of 45 days of incarceration and probation is appropriate in this case because Adkins (1) approached the Capitol building after admittedly witnessing violent clashes between police and rioters on the West Front of the Capitol; (2) entered the Capitol just before 2:15 p.m. through the Senate Wing Door within two minutes of the first breach of the Capitol at 2:13 p.m., on the heels of the rioters who smashed windows and kicked open the Senate Wing Door; (3) waved at other rioters to enter and helped a rioter through a broken window next to the Senate Wing Door; (4) celebrated his breach of the Capitol by yelling, dancing, and drinking alcohol inside the building; (5) spent a long time in the Capitol building during the riot, an hour and 18 minutes, including while Congress was still evacuating; (6) went right to the center of a conflict with police in the Capitol Visitor Center; (7) sent Facebook messages to a friend saying that he was drinking alcohol inside the building to prepare for a "fight"; (8) asked the recipients of his photos and videos not to share them with others; and (9) has failed to show any remorse and downplayed his conduct during FBI interviews.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

The Court must also consider that Adkins' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Adkins' crime support a sentence of 45 days of incarceration and 36 months of probation.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense pp. 1-3.

### Defendant Adkins' Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Adkins traveled to Washington D.C. from his home in Stephens City, Virginia with the intent to attend the former President's "Stop the Steal" rally by the Ellipse. *See* Statement of Offense, p. 3, ¶ 8. On January 5, 2021, he invited a friend through a Facebook message to ride with him and assured the friend that he would not want to leave Washington, D.C. early.

After the rally, Adkins walked toward the Capitol building with a large crowd. He joined the crowd on the West Front of the U.S. Capitol grounds. *See* Statement of Offense, p. 3, ¶ 8. He told FBI agents in post arrest interviews that he tried to make contact with Oath Keepers at the Capitol that he had met on an earlier trip to Washington D.C. to join up with them but was not successful in finding them.

On January 6, Adkins wore a black ballcap with the word "CHUCK" written on it in big white letters with gold wings on the bill, a brown neck gator, a green scarf, a grey sweatshirt, and a backpack.

3



*Image 1: Selfie Photograph of Adkins at the Capitol*

In a Facebook message to a friend sent while he was at the Capitol, Adkins described police deploying chemical agents against the crowd and stated that he had recorded video of the scene from this vantage point, saying, "[i]t was crazy, shit ton of pepper spray. Text my work phone for videos."[2]  In an interview on October 5, 2021, Adkins told FBI agents that he saw people scuffling with each other and with police and heard loud noises that he believed were flashbang grenades as he approached the Capitol.  Adkins also falsely told the agents there were no barriers in place when he approached the Capitol even though he sent a video to a Facebook friend that pictured an "Area Closed" sign in the background.  In a second interview with FBI agents on June 17, 2024, Adkins admitted that he saw rioters climbing on scafolding and that flashbangs were thrown close to him.  In the June 17 interview Adkins implausibly said he did not see violence against police outside the Capitol buidling, even though he was among the first of the rioters to enter the Capitol through the Senate Wing Doors after the breach of police lines on the West Front.

---

[2] Law enforcement officials were unable to recover Adkins' "work phone" and videos he referred to in messages to friends.

After police lines were breached, Adkins made his way up the Northwest Stairs to the Upper West Terrace with a dense mob of rioters.



*Image 2: Open-source video screenshot of Adkins (red circle) ascending the Northwest stairs*

Undeterred by flashbangs, chemical agents, and concussion grenades that he had just experienced, Adkins went to the Northwest Courtyard where rioters were violently breaking windows and kicking open the Senate Wing Door at approximately 2:13 p.m..  Less than two minutes later, just before 2:15 p.m., as alarms blared and rioters climbed through broken windows, Adkins entered the U.S. Capitol building through the Senate Wing Door.  Adkins entered the Capitol before the evacuation of Congress had even been ordered.  In an FBI interview on June 17, 2024, he disclosed that he entered the Capitol with the intent to force a delay in the "Certification" that he knew was happening inside the building.



*Screenshot from Ex. 1 - CCV video of the Senate Wing Door breach; at approximately 2:13:04 p.m. actual time (.06 mark in video clip) the window next to the door is breached; Adkins (red circle) then entered through the Senate Wing Door at 2:14:50 (Adkins is also circled in red in the video clip)*

Once inside, Adkins walked toward the Senate side of the Capitol. As he did, he quickly came into close proximity to police defending the building but that did not cause Adkins to leave the Capitol. Instead, he went back to the Senate Wing Door lobby.



*Image 3 – Screenshot from open-source video showing Adkins (red circle) in close proximity to police near Senate Wing Door*

6

Back in the Senate Wing Door area, that was then packed with rioters, Adkins waved other rioters into the Capitol and stepped over broken furniture to help a rioter enter through a broken window next to the Senate Wing Door.



*Ex. 1 – Screenshot from CCV video of Adkins (red circle) helping a rioter enter through a broken window next to the Senate Wing Door (Adkins is also circled in red helping the rioter enter beginning at the 2:30 second mark in the video clip)*

At 2:23 p.m., Adkins and the rioter he helped through the window talked together and then walked toward the Crypt.  In an FBI interview on June 17, 2024, Adkins disengenously claimed that the rioter he helped through the window and then spole with and walked toward the Crypt with was someone he didn't know and couldn't name. At 2:29 p.m., Adkins moved toward a first-floor exit west of the Crypt, the Law Library door.  Rather than  leave the Capitol through the Law Library door, Adkins walked away from the door holding a large, canned beverage that he had purchased that morning and brought with him to the Capitol in his backpack.



*Image 4 – Screenshot from CCV of Adkins (red oval) near Law Library Door with a drink*

In another exchange of Facebook messages, Adkins contemptuously bragged that he drank Coors Lite and Fireball whiskey in the U.S. Capitol building and that he was preparing for "fighting":

**Author** ████████████████████████████████
  **Sent** 2021-01-06 22:20:53 UTC
  **Body** Bro I'm watching on the news waiting for a ducking riot to start

**Author** Miles Adkins (Facebook: 100006517876437)
  **Sent** 2021-01-06 22:21:33 UTC
  **Body** I'm getting  food then fighting

**Author** ████████████████████████████████
  **Sent** 2021-01-06 22:21:55 UTC
  **Body** You guys better go out with a bang

**Author** Miles Adkins (Facebook: 100006517876437)
  **Sent** 2021-01-06 22:21:55 UTC
  **Body** I drank fireball and a coors  lite in the capitol

**Author** ████████████████████████████████
  **Sent** 2021-01-06 22:22:08 UTC
  **Body** Don't let it be for nothing

**Author** Miles Adkins (Facebook: 100006517876437)
  **Sent** 2021-01-06 22:22:24 UTC
  **Body** Nigga, you know this

At 2:30 p.m., Adkins, still holding the canned beverage, walked from the Crypt down to the Capitol Visitor Center.



*Image 5 – Adkins (red circle) descending stairs to Visitor Center*

At 2:31 p.m., Adkins had made it as far as the Upper Orientation Lobby in the Capitol Visitor Center. At 2:43 p.m., he talked to other rioters in the Upper Orientation Lobby near where a confrontation with the police was developing and he went right to the center of the group confronting police before the police swept the rioters out of the area.  In his June 17, 2024, interview Adkins also disclosed that in this area he saw a rioter wrestling a police officer on the ground.  He also claimed to have seen an officer fighting with a rioter and said that he verbally intervened to break them up.



*Image 6– Screenshot from CCV of Adkins (red oval) near rioters confronting police in the Upper Orientation Lobby of the Capitol Visitor Center*



*Ex. 2 – CCV of Adkins (red circle) confronting police with a group of rioters in the Upper Orientation Lobby of the Capitol Visitor Center (Adkins is also circled in red in the video clip)*

At 2:45 p.m., after police corralled rioters out of the Visitor Center, Adkins made his way back up the to the Crypt. A half-hour later, just before 3:18 p.m., undeterred by the direct confrontations with police, Adkins went back to the Crypt and drank fireball, yelled, chanted, and danced.



*Image 8 – Screenshot from open-source video of Adkins (red circle) in the Crypt*



*Image 9 – Screenshot from CCV footage of Adkins (red oval) dancing in the Crypt*

At 3:33 p.m., after an hour and 18 minutes inside the building, Adkins left the Capitol through the Memorial Door. As he left, Adkins yelled, "Let's go get a beer, let's go get a beer!"



*Image 10 - Screenshot from open-source video showing Adkins leaving the U.S. Capitol building*

### Adkins Social Media Posts

In a Facebook message on January 6, Adkins bragged that it was the pro-Trump rioters, and not Antifa, who assaulted the Capitol building that day, and sent a picture of himself (Image 3, above) to prove it:

| | |
|---|---|
| **Author** | ████████████████████████████████ |
| **Sent** | 2021-01-06 22:51:15 UTC |
| **Body** | How's the rally going I kind of here is a shit show |
| **Author** | Miles Adkins (Facebook: 100006517876437) |
| **Sent** | 2021-01-07 00:01:53 UTC |
| **Body** | Bro shit was nutz |
| **Author** | ████████████████████████████ |
| **Sent** | 2021-01-07 00:27:54 UTC |
| **Body** | I heard antifa took the capital or was that us |
| **Author** | Miles Adkins (Facebook: 100006517876437) |
| **Sent** | 2021-01-07 00:42:49 UTC |
| **Body** | Us |

When a Facebook friend implored Adkins to leave the Capitol on January 6 at 6:15 p.m. by calling on his sense of duty as a former Marine, Adkins didn't reply until 7:00. His response was that he was defending the country by attacking the Capitol:

> **Sent** 2021-01-06 23:16:04 UTC
> **Body** STAND DOWN MARINE! Protect your job. GO HOME.  I LOVE YOU
>
> **Author** ███████████████100025332151614)
> **Sent** 2021-01-06 23:17:59 UTC
> **Body** ???
>
> **Author** Miles Adkins (Facebook: 100006517876437)
> **Sent** 2021-01-07 00:01:24 UTC
> **Body** Got a country to defend

On January 8, a Facebook friend messaged Adkins to ask if he went to jail.  He responded, "Shhh, don't spread that shit, trying to stay low."  After sending videos and pictures to another friend (that the FBI was unable to recover) on January 9, Adkins counseled the friend not to share those items. In a Northern Virginia Daily newspaper article dated February 28, 2024, after his arrest for his conduct at the Capitol, Adkins claimed that he was being prosecuted because there was a "two-tiered justice system where they keep going after these Jan. 6 folks…"[3]

*Adkins Pre-Arrest FBI Interview*

On October 5, 2021, Adkins gave a voluntary pre-arrest interview to the FBI. During the interview, he admitted traveling to Washington to attend the rally on January 6, 2021. Adkins admitted seeing people scuffling with each other and with police officers.  He acknowledged that he heard loud noises that he thought were flash bang grenades. However, Adkins also disingenuously claimed that there were no barriers when he arrived in spite of the fact that he entered the Capitol less than two minutes after the first breach of the building.  He claimed that

---

[3] *See*, https://www.nvdaily.com/nvdaily/miles-adkins-says-he-wont-be-bullied-off-school-board-after-jan-6-charges/article_22298c54-aff7-5681-8cd3-db67a8d4fab6.html (last visited June 23, 2024).

13

police were letting people in the building even though entered by walking over broken glass less than two minutes after the violent break in. Adkins claimed that he saw news about rioters activities inside the Capitol but refused to talk about his own activities inside the building in his initial interview.

*Adkins' FBI Interview Required by the Plea Agreement*

Adkins was interviewed on June 17, 2024, in accordance with the plea agreement. Rather than express remorse at this point, he attempted to justify his conduct on January 6 by claiming that he was exercising his first amendment rights and that he believed his prosecution was politically motivated because other non-violent protestors who have entered the Capitol for other protests have only faced fines. Again, he claimed that there was a two-tiered justice system, in spite of the fact that he also admitted that he had seen a rioter wrestling with a police officer on the ground during the Capitol riot on January 6, and that he walked over broken glass to enter the Capitol building. In his June 17 interview he minimized the violence against police on the West Front of the Capitol. He falsely claimed that he left the Capitol because he heard that Ashli Babbitt had been shot, when in truth he left in a celebratory mood yelling, "let's go get a beer!"

*The Charges and Plea Agreement*

On February 23, 2024, the United States charged Adkins by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (a)(2) and 40 U.S.C. § 5104(e)(2)(D) and (e)(2)(G). On June 5, 2024, the United States charged Adkins by a two-count Information with violating 40 U.S.C. § 5104(e)(2)(D) and (e)(2)(G). On July 2, 2024, pursuant to a plea agreement, Adkins is scheduled to plead guilty to Counts 1 and 2 of the Information. By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Adkins now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and (G). As noted by the plea agreement, the defendant faces up to six months of imprisonment and a fine of up to $5,000. Adkins must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As these offenses are Class B Misdemeanors, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 45 days of incarceration and 36 months of probation.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Adkins' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Adkins, the absence of violent or destructive acts is not a mitigating factor. Had Adkins engaged in such conduct, he would have faced additional criminal charges.

Adkins had a front row seat to violence and property destruction on the Capitol grounds. He entered the Capitol through the Senate Wing Door just before 2:15 p.m. a mere two minutes after the initial violent breach of not only that door but of the Capitol.  He admitted that he saw rioters fighting the police and heard flash bangs igniting.  Adkins social media messages show that he was an early and enthusiastic member of the mob, even helping another rioter into the building through a broken window and walking toward police confronting rioters in the Visitor Center.

After entering, Adkins went deep into the Capitol and remained for an hour and 18 minutes, a very long time compared to the conduct of other rioters that day. That means he presented an ongoing threat to police and others, and added to the distractions of the police as they sought to quell the riot. He treated the building with abject disrespect by drinking alcohol, dancing, yelling, and chanting, in the midst of such obvious destruction and violence.  Rather than promptly accepting responsibility for his unlawful conduct, Adkins did the opposite, urging friends not to post his pictures or videos and accusing others of trying to smear him politically.  Even as late as his interview on June 17, 2024, he gave lip service to accepting responsibility by pleading guilty while at the same time claiming he is a victim of an unfair system.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration and for a period of probation in this matter.

### B.  Adkins' History and Characteristics

Adkins' criminal history consists of a conviction in Loudoun County, Virginia, on June 8, 2023, for Reckless Driving after being arrested for driving under the influence and refusing to undergo a breath test.  He received a suspended sentence of 30 days incarceration and 12 months of supervised probation that will expire on September 26, 2024.  He was convicted in Martin County, Florida for "Hit and Run" on November 12, 2014, with a sentence of probation.  His

probation was revoked on November 20, 2018, and he was sentenced to six months of probation and time served.  He also appears to have been convicted several times of driving under a suspended license after the hit and run conviction.

Adkins has been compliant with his conditions of pre-trial release for his federal charges as of May of 2024. Adkins has been employed in the insurance industry since 2018.  He was elected to a four-year term with the Frederick County school board in 2021.

Adkins reported to the FBI that he served in the Marines as was referenced by one of his Facebook friends in a message.  Military service and training should have taught Adkins the importance of supporting and defending the rule of law and the police officers who were trying to protect the seat of Congress.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to Adkins also weighs heavily in favor of a term of incarceration. Adkins told the FBI that he had acted as an escort for Oath Keepers at events in November or December of 2020 in Washington D.C.  and tried to contact members of the Oath Keepers on January 6 through the Signal cellular phone application.

Although Adkins accepted responsibility by stipulating to all of the facts underlying his guilt and resolving his case via a guilty plea, Adkins has not taken any steps to denounce his words and actions on January 6, 2021. Instead, Adkins minimized his conduct to the FBI in his pre-arrest interview while pleading with his friends on social media not to disclose his criminal activity. On June 17, 2024, Adkins not only failed to express remorse but attempted to justify his conduct and portray himself as a victim. Adkins' conduct on January 6, his prior conviction and probation revocation, repeated convictions for driving on a suspended license, and attempts to downplay and prevent others from disclosing his conduct demonstrate a very real need for specific deterrence in

the form of incarceration. This is especially so when compared to other defendants who do not have criminal records, or did not remain involved in the thick of the riot for as long as Adkins.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Adkins based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Adkins has pleaded guilty to engaging in disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol and parading, demonstrating, or picketing in any Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) and (e)(2)(G). These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who were

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

among the first rioters to breach the building within the Capitol. A defendant's entry into the Capitol while members of the House of Representatives and the Senate were still present places that defendant in a more serious category of offenders. A defendant who walked toward a direct confrontation with police to display the dominance of the mob over the will of the people and remained inside for an hour and 18 minutes is a seriously disruptive offender.

In *United States v. Michael Dillon*, 23-cr-108 (TSC), the defendant was a 69 year old man who walked with a cane.  He approached the upper west terrace about 2:32 p.m. where he saw a rioter the climb the side of the Capitol building. Dillon approached the Senate Wing Door even though he saw it was flanked by a broken window. He stood outside that door for about 13 minutes, where he was exposed to tear gas and heard chants of "USA" "Let us in" and "Fight for Trump." Dillon watched as the mob streamed through the door and then overwhelm police officers.  At 2:50 p.m., Dillon himself climbed through the window. He remained inside for only five minutes, during which he chanted, "Do your Job." Dillon pleaded guilty to violating 18 U.S.C. § 1752(a)(1). Judge Chutkan sentenced him to 45 days' incarceration and 12 months' supervised release.

In *United States v. Derek Jancart*, 21-cr-148 (JEB), the defendant pleaded guilty to violating  40 U.S.C. § 5104(e)(2)(D). He engaged in some of the same or similar aggravating conduct as Adkins. Jancart (1) brought a gas mask and two-way radios to the Capitol building on January 6; (2) was aware of the potential for violence because he went to the Capitol only after hearing it had been "breached"; (3) laughed and cheered while the forward line of the rioters broke through the police line; (4) posted a video to Facebook of a codefendant screaming at officers, "we have you surrounded"; (5) penetrated the U.S. Capitol all the way to the Speaker's conference room; (6) showed a total lack of remorse in his statements on Facebook; (7) spread propaganda on social media by falsely downplaying the violence on January 6 and suggested he might engage in

future violence; and (7) likely destroyed evidence by deleting videos and message threads from his phone. Chief Judge Boasberg sentenced Jancart to 45 days' incarceration.

In *United States v. Athime Gionet*, 22-cr-132 (TNM), the defendant pleaded guilty to violating 18 U.S.C. 5104(e)(2)(G), and was sentenced 60 days of incarceration, 24 months of probation, a $2,000 fine, and $500 restitution.[5]  Like Adkins, Gionet breached the Capitol and remained inside for over an hour, although Gionet breached two separate times.  Like Gionet, Adkins helped another rioter enter the Capitol through a broken window.  Gionet live-streamed a video on social media from the Capitol, while Adkins sent videos and messages through social media to friends while at the Capitol.  Gionet went into two senators' offices.  Adkins was stopped by police when he went toward the Senate side of the Capitol and  instead of leaving then went to the Crypt, and down into the Visitor Center where he walked to the middle of a confrontation with police. Unlike Adkins, Gionet was captured on video yelling expletives at United States Capitol Police Officers. Gionet had recent prior convictions for assault, disorderly conduct, and criminal trespass. Adkins has an older conviction for hit and run, driving under a suspended license and a recent conviction for reckless driving. The government acknowledges that Gionet is likely considered worse by comparison, given his digital involvement during the course of the riot, and his more aggressive stance towards police.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

---

[5] Although this case predates the decision in *United States v. Little*, 78 F.4[th] 453 (D.C. Cir. 2023) Gionet did not object to a split sentence.  In recent litigation, the Court denied Gionet's request for early termination, in part based on *Little*.  See 22-cr-132 (TNM), ECF No. 88.

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.   Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Adkins must pay $500 in restitution, which reflects in part the role Adkins played in the riot on January 6.[7] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Adkins' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

## VI.   Fine

Adkins' convictions subject him to a statutory maximum fine of $5,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Adkins to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Adkins has not shown an inability to pay, so this Court should impose a reasonable fine consistent with U.S.S.G. § 5E1.2(a), (d), and (e).

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Adkins to 45 days of incarceration and 36 months of  probation, and 60 hours of community service. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Adkins' liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Cari F. Walsh*
CARI F. WALSH
Assistant United States Attorney
MO Bar No. 37867
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, DC 20530
Phone: (816) 426-4307
Email: Cari.Walsh@usdoj.gov